UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MAGELLAN DIAGNOSTICS, INC.,<br><br>Defendant | Case No: 24-cr-10146-PBS |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States submits this memorandum in advance of the October 9, 2024 sentencing of the defendant, Magellan Diagnostics, Inc.

On May 21, 2024, the government filed an Information charging Magellan with two misdemeanor violations of the federal Food, Drug, and Cosmetics Act (FDCA). Dkt. 1. The charges are based on Magellan's failure to timely notify the FDA about: (1) a malfunction that caused its LeadCare blood lead testing devices to produce inaccurate results, and (2) Magellan's subsequent corrective change in the devices' instructions for use without prior FDA approval. Magellan waived indictment and tendered a guilty plea to the Information on June 27, 2024 pursuant to a Federal Rule of Criminal Procedure 11(c)(1)(C) plea agreement. Dkt. 3, 15.

The government now asks the Court to accept the binding plea agreement executed by the parties and sentence Magellan according to its terms. The recommended disposition in the plea agreement—a fine of $21.8 million and forfeiture of $10.9 million—is one part of a larger resolution to hold Magellan accountable for the full scope of its misconduct. In pleading guilty to FDCA violations in this case and entering into a deferred prosecution agreement

(DPA) in the related case of *U.S. v. Magellan Diagnostics, Inc.*, 24-cr-10144-PBS, Magellan accepts responsibility for, among other things, failing to timely inform the FDA and its customers about the serious malfunction affecting its LeadCare devices and causing harm to patients who received an inaccurate blood lead test. In addition to the significant monetary penalties paid pursuant to the FDCA plea agreement, Magellan is obligated under the DPA to retain an independent monitor to oversee its regulatory compliance functions and administer a fully funded victim compensation program, a program that meets, if not exceeds, the requirements of 18 U.S.C. §§ 3663 and 3663A, which do not apply to the charges in this case. It is because of these comprehensive DPA obligations that the government is not seeking to impose a term of probation or an order of restitution as part of the sentence in this case.

## I.    Offense Conduct

The following facts are set forth, without objection, in the presentence investigation report (PSR). *See* PSR ¶¶9-23.

The defendant, Magellan Diagnostics, Inc., headquartered in Billerica, Massachusetts, is a medical device company that sells products for detecting lead levels in the blood of children and adults. During the relevant time period, Magellan sold its LeadCare lead-testing devices to customers located throughout the United States and in foreign countries.

Magellan's blood lead level testing devices work by collecting a blood sample—either from a vein, known as a venous test, or through a finger-stick, known as a capillary test—and mixing the sample with a chemical, called a treatment reagent, that separates lead from red blood cells so that it can be detected. That mixture is placed onto a sensor that goes into the Magellan device for a blood lead level reading.

In 2012, Magellan applied for FDA approval of a new device called LeadCare Ultra. In its application, Magellan claimed that LeadCare Ultra was substantially equivalent to a device that had been on the market for years called LeadCare II, which the company claimed gave accurate results with immediate testing of the blood sample-reagent mixture.

In early 2013, the FDA noted several deficiencies in Magellan's LeadCare Ultra application and requested additional supporting data. Magellan began conducting additional studies in response to the FDA's request and discovered a malfunction that resulted in lower blood lead levels when the blood sample was tested shortly after it was mixed with treatment reagent and higher levels when the mixture was tested after sitting—or "incubating"—for a period of hours or days.

Magellan failed to notify the FDA about the study results, and the FDA—unaware of the malfunction—cleared LeadCare Ultra in August 2013. Magellan delayed its launch of the new device due to concerns about the malfunction, which continued appearing in studies through the end of 2013. Nevertheless, Magellan released LeadCare Ultra for sale in December 2013, without notifying customers or the FDA that the malfunction could cause inaccurate results, and with a label and instructions for use that allowed for immediate testing upon mixing the blood sample with the treatment reagent.

When performing the tests on LeadCare Ultra in 2013, Magellan simultaneously conducted studies to determine whether the malfunction also affected LeadCare II—the device that was already on the market—and found that, when used to test venous samples, it did. Magellan did not inform its customers or the FDA of the malfunction impacting LeadCare II either.

Beginning in or around August 2014, certain LeadCare Ultra customers discovered the malfunction on their own and reported to Magellan that they had observed unexpectedly low test results when samples were tested immediately after being mixed with the treatment reagent. In response, Magellan sent its LeadCare Ultra customers a letter about the malfunction, advising that they should allow the blood-treatment reagent mixture to sit for a minimum of 24 hours before testing, which contradicted the label that permitted users to analyze the sample immediately after mixing. Still, Magellan did not notify the FDA about the malfunction or about its letter to customers changing the user instructions for LeadCare Ultra.

It was not until April 2015, eight months after receiving the first customer complaint, that Magellan finally submitted what is called a medical device report, or MDR, to the FDA about the malfunction. Under the FDCA, medical device manufacturers are required to submit MDRs within 30 days of becoming aware of a device malfunction likely to cause or contribute to serious injury or death if it recurred.

Then, in August 2015, Magellan changed the LeadCare Ultra label to incorporate the 24-hour incubation instruction it had provided to customers in the customer letter. However, Magellan did not seek approval from or notify the FDA of the change to its label as required. Finally, in November 2016, Magellan submitted an amendment to the LeadCare Ultra MDR disclosing to the FDA that the malfunction also affected the LeadCare II device when used to test venous samples.

The FDA ultimately found that the LeadCare devices could not accurately test venous blood samples, regardless of the recommended incubation time, and recommended a recall of all Magellan devices using venous samples.

Count One of the Information—charging Magellan with the introduction of misbranded devices into interstate commerce—is based on the company's marketing/sale of LeadCare Ultra and LeadCare II without filing the required MDRs regarding the malfunction affecting both devices.

Count Two—charging Magellan with the same violation—is based on the company's failure to notify the FDA about its change to the label/instructions for LeadCare Ultra, specifically its introduction of LeadCare Ultra into the market with instructions to incubate the blood-treatment reagent samples for 24 hours without providing the FDA with the required pre-market notification at least 90 days before distributing a significantly changed device, and without filing the necessary reports of device correction initiated to reduce a risk to health posed by the device.

As a result of the charged conduct, Magellan realized a pecuniary gain of approximately $10.9 million.

## II.    Plea Agreement Terms

The government and Magellan entered into a plea agreement ("Agreement") pursuant to Rule 11(c)(1)(C), which Magellan signed on May 21, 2024 and acknowledged at the Rule 11 hearing on June 27, 2024. Dkt. 3, 15. Among other things, the Agreement requires Magellan to waive indictment and plead guilty to an Information charging the company with two misdemeanor violations of the FDCA, 21 U.S.C. §§331(a), 333(a)(1) (Agreement ¶1); and waive its right to appeal or collaterally attack its conviction and sentence (Agreement ¶6). With respect to the Guidelines calculations, the parties agree that, while the fine provisions of the Guidelines do not apply to organizational defendants for misdemeanor violations of the FDCA (USSG §8C2.1), the following are consonant with the Guidelines and

appropriately consider Magellan's conduct under 18 U.S.C. §3553 and §3572 and USSG §8C2.10: Magellan's base fine is $10.9 million (USSG §8C2.4(a)); its culpability score is five (USSG §8C2.5(a)); the appropriate multiplier range is 1.0 to 2.0 (USSG §8C2.6); and the resulting Guidelines fine range is $10.9 million to $21.8 million (USSG §8C2.7). Agreement ¶4.

Based on these calculations, and in consideration of the statutory sentencing factors and Magellan's commitments to compliance oversight and victim compensation under the DPA, the parties agree on the following disposition: a fine of $21.8 million, forfeiture of $10.9 million, no disgorgement, no term of probation, and no order of restitution.[1] Agreement ¶5.

Under Rule 11(c)(1)(C), if the Court accepts the Agreement, the Court must include the agreed disposition in the judgment. Agreement ¶3.

### III. PSR Guidelines Calculations

Consistent with the parties' calculations set forth in paragraph 4 of the Agreement, the United States Probation Office (USPO) determined that, while the appropriate fine in this case is governed by statute and not the Guidelines, Magellan's fine range under the Guidelines would be $10.9 million to $21.8 million. PSR ¶¶54-65. Probation also determined that, given Magellan's commitment under the Agreement and DPA to pay a criminal fine, forfeiture, and victim compensation and retain a compliance monitor, neither disgorgement, probation, nor restitution is required or recommended. PSR ¶¶66-69, 78.

---

[1] Because misdemeanor violations of the FDCA are not subject to mandatory restitution under the relevant criminal statutes or the Guidelines (*see* PSR ¶¶ 67, 69, Dkt. 14), the parties agreed upon an alternate mechanism—the Victim Compensation Program set forth in the DPA—to achieve their mutual goal of compensating individuals who were harmed by the relevant conduct. *See* PSR ¶¶24-25, 27, 68; DPA ¶¶6-9 & Attachment F.

## IV.     Sentence Recommendation

The government asks the Court to accept the agreed disposition set forth in the plea agreement and sentence Magellan accordingly. The plea agreement provides sufficient and appropriate financial punishment for Magellan's criminal conduct in the form of a $21.8 million fine and requires forfeiture of $10.9 million in ill-gotten gains. Importantly, the plea agreement also recognizes Magellan's obligations under the DPA to retain an independent monitor to oversee its corporate compliance functions and to administer a comprehensive victim compensation program. Given the significant financial penalties paid pursuant to the plea agreement and the company's attendant compliance and victim compensation obligations under the DPA, the government submits that disgorgement, probation, and a discretionary restitution order are not necessary components of the sentence imposed for Magellan's FDCA violations.

Indeed, the plea agreement disposition reflects only part of Magellan's obligations to account for its criminal conduct. That conduct, which involves Magellan's failure to timely inform the FDA and its customers about a serious malfunction in its LeadCare devices, causing patients to unknowingly receive inaccurate blood lead test results, underlies both the FDCA violations charged in this case and the fraud conspiracy allegations charged in connection with the DPA. Standing alone, neither the plea agreement nor the DPA accounts for the full scope of Magellan's misconduct. But taken together, they require Magellan to admit its criminal actions, pay sizeable monetary penalties, improve its regulatory compliance program, and compensate individuals harmed by the LeadCare device malfunction. Given this, and for the reasons below, the Court should accept the plea agreement disposition.

First, the financial penalties are substantial. During the relevant time, Magellan realized a gain of $10.9 million from the sale of LeadCare devices and test kits affected by the malfunction. The plea agreement requires Magellan to forfeit those ill-gotten gains. The agreement also requires Magellan to pay a fine of $21.8 million, which is at the top of the Guidelines range that would apply if the company were charged with felony, and not misdemeanor, FDCA violations. The recommended fine is consonant with the statutory sentencing factors, particularly providing just punishment and affording adequate deterrence.

Second, Magellan's commitment under the DPA to compliance monitoring and victim compensation obviates the need to impose probation or restitution, both of which are discretionary for the offenses at issue. While a term of probation supervised by the USPO may provide adequate oversight for certain corporate offenses, the FDCA violations in this case involve interpretation of highly specialized rules and observance of strict procedures established by the FDA. For this reason, the DPA requires Magellan to retain a qualified, independent monitor to evaluate and oversee its regulatory compliance program for two years. Magellan's compliance expectations are detailed in Attachment C of the DPA, the monitor's necessary qualifications and selection process are detailed in paragraphs 11-17 of the DPA, and the monitor's oversight duties and reporting obligations are detailed in Attachment D. Given the complexity of FDA regulations governing Magellan's LeadCare products, the appointment of a monitor with in vitro diagnostic device regulatory expertise will ensure that the company's compliance program is designed to deter and detect any potential FDCA violations and protect the public from future harm.

The nature and circumstances of Magellan's criminal conduct likewise necessitate expertise to identify and compensate potential victims. The Centers for Disease Control and

Prevention (CDC) estimated that tens of thousands of individuals, mostly children, received an inaccurate LeadCare blood lead test during the relevant period. However, because Magellan did not timely disclose the malfunction to the FDA or customers who used the LeadCare devices to test patients' blood lead levels, it is difficult to precisely determine the scope of the harm. An estimated percentage of inaccurate results across all LeadCare devices cannot identify exactly which patients received a false low blood lead test in any given hospital lab or pediatrician's office on any given day. In other words, there are certainly patients who were harmed—who unknowingly received a false low result and did not receive necessary medical treatment for lead exposure—but as of today, neither they nor their doctors nor the government know for certain who all of those patients are. The government is committed to ensuring that all victims of Magellan's misconduct are fully and fairly compensated for their economic loss. But without a complete list of known victims with easily ascertainable injuries, the statutory restitution model is unlikely to achieve that goal. Instead, Attachment F to the DPA sets forth a comprehensive plan for first identifying and then compensating patients who suffered economic harm from the delayed detection of lead poisoning as a result of the LeadCare malfunction. The dual challenges of identifying victims and measuring their economic loss will require considerable financial resources, dedicated personnel to conduct outreach and review medical records, medical expertise in evaluating the effects of lead poisoning, and extensive experience in complex claims administration. The compensation program detailed in the DPA recognizes these challenges and mandates that Magellan invest the time, money, and expertise necessary to ensure that victims receive just compensation for the harm it caused.

Finally, the plea agreement disposition takes into account Magellan's cooperation—during the criminal investigation and in the prosecution of former executives charged with conspiracy to defraud the FDA and the company's customers—and its acceptance of responsibility for its misconduct. By cooperating, pleading guilty, agreeing to pay large financial penalties, and assuming extensive compliance oversight and victim compensation obligations under the DPA, Magellan has demonstrated a commitment to holding itself and its former employees accountable, to fostering a culture of compliance, and to making its victims whole. Under these circumstances, the recommended sentence is sufficient but not greater than necessary to achieve the goals of sentencing.

## CONCLUSION

For the reasons stated, the government requests that the Court accept the binding plea agreement and sentence Magellan according to its terms.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:  /s/ Kelly Begg Lawrence
James D. Herbert
Kelly Begg Lawrence
Leslie A. Wright
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                            */s/ Kelly Begg Lawrence*
                                            Kelly Begg Lawrence
                                            Assistant United States Attorney

Date: October 3, 2024